Okay and we are going to go on to the next case and that case is appeal number 20-2783 United States v. William Mikaitis Hello Mr. Thompson. Hello Your Honor. Good afternoon and may it please the court. This case provides a paradigmatic example of what has become a rampage overuse of the deliberate avoidance instruction in criminal cases throughout the circuit. This has allowed the government to effectively reduce their burden of proof when it comes to the mens rea requirement in cases like Dr. Mikaitis' and other cases. In this case, there was no evidence that Dr. Mikaitis took any active step to avoid learning or confirming any knowledge, to avoid learning knowledge that anything illegal. What about the fact that after he received the first shipment or shipment of phentermine at his own office, he then obtained a second DEA number and had all the subsequent shipments sent to the clinic? Couldn't one reasonably interpret that act as a deliberate effort to avoid knowing just how much of that substance Mr. Jennings was ordering and dispensing along with some other facts of course, but isn't that a fact difficult to overcome? No Your Honor. While that is an action that he took, I don't think it can be reasonably interpreted as an action meant to avoid learning any truth. If the shipment was sent to his office and he saw it there, he already knew the truth. So any further shipments weren't going to give him any additional knowledge that he didn't already have at that point. Why do you say that though? I mean, because I mean, one shipment may be a big shipment and the next shipment might be a very small one. I'm not sure that's true, but I want to actually take a step back. The issue presented in your brief is whether the district court erred in denying, I think that was a typographical error, Your Honor. In giving the deliberate avoidance jury instruction over the objection. And so I read that as that this was an instruction based appeal. You thought there was a problem with the giving of the instruction. Yes. But the district court judge amended the pattern instruction in response to the colloquy that you all had had. And added, and that he deliberately took actions to avoid the truth. So if we think the jury is following the instructions, the jury finds actions. There's nothing wrong with the instruction. I don't see you saying that the evidence doesn't match up with the instruction. An evidence appeal would be a different appeal. We are saying that the evidence did not support the giving of the instruction, Your Honor, because there was no evidence that he took a deliberate step to avoid marrying the truth. And you disregard this redirecting of the shipments. I mean, a lot of these things strike me as, you know, it depends which end of the telescope you want to look at the mats, because he deliberately goes to the side doors. He deliberately, you know, looks at three files. He, you know, doesn't know that there's this phenomenal quantity that's going, 17,000 monthly prescription bottles, which means he's seeing almost 600 patients a day, which seems excessive, since he does know that he's the only doctor there. Your Honor, I think, again, that may have been another error. It should be 17,000 pills per month, not bottles of pills. I believe they were bottles of approximately 100 pills in each bottle. But the going through the side door, I think, is a bit of a red herring in this case. That's not a deliberate action. There's no evidence that there was any reason he wouldn't go through the side door. There's no reason to believe that he was doing anything specifically in order to avoid learning what else was going on in the clinic. He was just entering a door that was, for whatever reason, the most convenient way to get to Mr. Jennings' office. What about the cash payments for this rather small amount of work? Well, that was the arrangement he had with Mr. Jennings, Your Honor. There's nothing. Maybe that should have made somebody suspicious. But whether or not he was suspicious is a subjective inquiry. You can't just assume, well, somebody else would have been suspicious in those circumstances. So he must have been, and therefore, he must have taken a step to avoid confirming those suspicions. What about him telling Jennings not to divulge much to his girlfriend when his girlfriend came to pick up the cash? Without the context of knowing what it was, he wasn't supposed to divulge to the girlfriend, Your Honor. I don't think that can do much for the inquiry we're undertaking here. It could have been about how much money he was making. It could have been... It can certainly, you know, tend to make a jury think about it. And am I right in thinking that the quantity of pills that Mr. Jennings was ordering would have been the most direct evidence he was dispensing Phenermine to far more people beyond those whose files Dr. McItyus was reviewing each week? And that could have been evidence of that, Your Honor, although I think that would go directly to knowledge rather than delivered avoidance. Because once again, there's no evidence that... The evidence in this case was basically either that he did know or that he did not. And if he did not know, then there needed to be some evidence that he should have taken steps that he didn't take or that he didn't take steps that he... That he altered his behavior in some way to avoid learning that information. What about reviewing his credit card statement to see what kind of, you know, orders were going through? Well, Your Honor, there was evidence of at least one occasion where he reviewed his credit card statement because there was a different vendor on it that he hadn't previously ordered from and he asked Jennings about that. So I think the evidence doesn't support that he wasn't looking at it at all. He certainly was at some point. I think that's just belied by the evidence in the case, Your Honor. Whether he knew the exact number of pills is a different question, but there's no reason to believe that he was specifically avoiding doing some math to calculate what that would be in order to avoid confirming the number of pills. The evidence was that he received a shipment at his office to begin with, so he was at least in some sense aware of the size of the shipments that were receiving. There's no reason to believe that was a smaller shipment, as Your Honor postulated it might have been earlier. If that evidence had been in, then we'd be perhaps undertaking a different question here. But the problem in this case is not only was the instruction given, but of course the government then argued during closing arguments that this evidence of him going through the side door and receiving... Who did he think was prescribing the pills? Oh, he was the person prescribing them, Your Honor. But he only looks at four files, and even if it's 17,000 pills a month and not bottles, that's not for four people. Your Honor, he reviewed, I believe the testimony was four to eight files per week, which doesn't help the map a whole lot, but it's at least a small difference. Let's say it's eight times four is 32. 32 people consume 17,000 pills? And Your Honor, he was not aware of the total number of pills. That was his testimony. There was no evidence to the contrary. He believed, and I believe his girlfriend testified that she also believed, that pills were only being prescribed to patients whose files he had reviewed. Now, there were certainly refills being given, both with and without his knowledge. There was testimony about refills being given in the mail that he had no involvement in as well, and the fact that he believed that pills were not being given to people that he didn't sign off on doesn't establish that he only didn't know that because he chose to avoid learning. He believed that he understood the agreement he had with Jennings. Jennings went behind his back and was doing things without his knowledge, and certainly the evidence established that he was careless or negligent in not knowing these things, but that's different from consciously avoiding learning them. And Your Honors, if there are no further questions at this time, I'd like to reserve the remainder of my time for a vote. Thank you very much. Okay, Ms. Kosanek. Good afternoon, and may it please the Court. The District Court did not abuse its discretion in instructing the jury on deliberate indifference. The instruction, I'm sorry. Avoidance. I'm sorry, deliberate avoidance. The instruction was well supported by the evidence in this case. The defendant testified that he had an all-cash arrangement with Jennings, that he permitted Jennings to use his DEA number as part of the clinic. Can I ask you a question? Do doctors typically have more than one DEA number? Yes, my understanding is that pursuant to regulation, DEA numbers are site-specific. So if a doctor is, as the defendant was here, acting as a doctor at two different facilities, with the exception of, I think that there's an exception for if there's multiple locations of the same clinic, but where a doctor is exercising or acting in the capacity at two different locations, then they would need two different DEA numbers. And in all candor, I do want to clarify something about the shipment that originally went to Advocate, and then the shipping address is being changed for the subsequent shipment, which is, when I was reading the report, it looks like there may have been some testimony that his second DEA number was under review at the time that he started getting shipments at Advocate. And so it may have been the defendant's intention, or at least a reasonable view of the evidence, could have been that he intended all along to have those shipments received at the clinic. The government's view is that, you know, that still is evidence, as part of the global scheme of evidence here, that he was avoiding confirmation of the truth. And that evidence included his own testimony that, despite this arrangement with Jennings, despite the fact that he didn't see patients but still had massive numbers of prescriptions going out the door and pills being ordered, he claimed in his own testimony that he didn't know that Jennings was unlawfully distributing substances. Now, remind me, you've argued that he would have been the only person authorized to write prescriptions, I'll put it that way. You know, this nurse practitioner who lasts for two days could have done it, but does he admit that he was the only person with the authority to write prescriptions, or does he say he thinks other people with that authority were there? His testimony, as I read it, was pretty vague on that point. So he confirms that he was the doctor at the clinic. His name was on the wall. He was the authorizing physician. When he was asked- But were there any other medical professionals associated with the clinic, other than the woman who left after two days? I don't think that there was, Your Honor. And when the defendant was asked about this, whether there was a written agreement with another nurse practitioner, he deflected it and he said, well, that was Jennings' arrangements. I didn't get involved in that. That was Jennings' thing. And it just demonstrates that when presented with these incredibly suspicious circumstances, he's a doctor at a clinic but never sees patients. He doesn't give the tests. He's not the prescribing physician when those pills are being received, despite- But his name is on the bottles, right, as the prescribing physician? Yes, Your Honor, I believe that it was. And he testified that he understood that he was reviewing the patient charts afterwards, he was signing off on it, and then they would come back for the prescription. That was his testimony. You know, the government's view of that was that that's not what was happening. And that the defendant, that put the defendant on, you know, it gave him reasonable knowledge that something was suspicious here, and then he took steps to avoid it, including by absenting himself from the clinic, not attending, you know, not seeing patients at the clinic, structuring his involvement with Jennings and the patients in a way where he wasn't interacting with them, not interacting with the staff. When he was there, he was only reviewing the patient charts that were provided by Jennings and not, you know, selecting patient charts to see if there was anything suspicious in there, like blood tests not being performed, et cetera. He, you know, admitted in his testimony that he didn't look around, never saw mailing materials, even though 2,700 packages were mailed out during the course of this scheme. You know, this is strong evidence of deliberate action taken as the district court, as you noted, instructed the jury as a modified pattern instruction here to account for the defendant's interpretation of this court's precedent. The evidence reasonably supported the giving of this instruction given these circumstances. Other than going to the office to pick up the cash was the girlfriend involved in any way? I don't think that the testimony indicated her involvement other than the facilitation of receiving the cash and depositing it. At least that's my belief based on the review of the transcripts. I had one question as far as the pills themselves. Were these pills being sold one at a time? I don't know. I don't know the answer to that question, but I believe, I would assume not, that they were being prescribed in the form of multiple pills in a bottle. Well, they weren't selling them by the bottle, were they? I don't know the answer to that question. I'm sorry, Your Honor. Well, the only reason I'm asking is because I'm curious about the amount of money that they're selling a pill for. To give him 17, whatever it is, to every week and get a certain amount of money, they must have been selling these pills to, unless they were sold in bulk where somebody else buys a whole bunch of them and goes on with their own distribution. I'm just not clear exactly how much a pill they were selling it for. If they're selling it for $10 a piece or something, or do you know? And are you referring to the sale by the weight loss clinic or by the distributors from whom Jennings was obtaining the substances? No, I mean, what's Jennings selling these for, the amount? I don't know the quantity that he typically prescribed these in, whether it was a pack of 10 or a pack of 30 or otherwise. I do know that there were some conversations when Jennings was ordering them in like 10 pack or I'm sorry, a hundred pack bottles or something along those lines. But I don't know the full answer to your question. I'm sorry. In other words, what you don't know is if they were repackaged by Jennings. I don't know the answer. Yes. Sorry about that. In sum, the evidence here very clearly supported the giving of this instruction. The defendant had strong suspicions of the illegality, if not actual knowledge, and deliberately took action in order to avoid confirming those suspicions. Part of your theory has to be that avoidance measures are in themselves actions. Yes, Your Honor. It's not just sitting there with psychological qualms. Yes. I think that this court's precedent support that avoidance measures could be overt physical acts as well as behavior. Driving a different route through town or something. Refer to this in different ways. Macias uses the term behavior. Gia Cianetti uses the term efforts. Those things can be physical, like I'm going to change my commuting route as Macias talks about, but it also can be just the structure of these interactions, like the fact that he, from the very start, wasn't seeing patients at the clinic, wasn't interacting with people, in addition to the failure to ask questions that's discussed in Macias as well. There are circumstances in which that very much is unnatural, including in this case, in the context of a medical professional that has certain duties. In light of that, the evidence is very strong. And then in addition, as Your Honor had noted, the instruction kind of narrows that to things that are more fairly interpreted as actions. And so the government would ask that this court affirm the district court's judgment. Thank you. Thank you very much. Okay, Mr. Thompson. The evidence certainly established. We'll give you two minutes. Thank you, Your Honor. The evidence certainly established that Dr. Macias was a bad doctor, that he was lazy and curious and aloof, but that's not the same thing as establishing that he suspected there was some sort of illegal activity going on. If he did not know, which was his defense, then there must be some conscious step he took to avoid learning and confirming some suspicion that he had. And simply redirecting shipments to the place where they were going to be dispensed from isn't a conscious step to avoid learning the truth. Going in a side door to meet with Jennings and his office as they agreed he would is not a conscious step. And failing to ask questions that he didn't care what the answers to would be is not a conscious step. It's carelessness. It might even be recklessness, but that's not the standard that somebody is held to in a criminal case. It's not enough to substitute for knowledge in an 841 case for a doctor who's charged as Dr. Macias was. The government argued in its closing argument that because he took these steps, because he went through a side door and because he redirected the shipment of the pills to where they were supposed to go to begin with, that somehow that was enough for them to meet their burden of proof because that's what the instruction given by the district court permitted them to argue. And in doing that, they effectively lessened their burden of proof and diminished the mens rea requirement for an 841 charge. And that renders the conviction in this case infirm, and it's because that instruction was given that they were allowed to do that. If there are no further questions, I'll ask that you reverse the conviction in this case. Thank you very much, and the case will be taken under advisement, and the court will be in recess until tomorrow morning.